# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| JUSTIN N. BANDY, | ) | Case No. 1:19-cv-164 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Christopher H. Steger |
| KELVIN D. ROBERTS, | ) | |
| | ) | |
| *Defendant*. | ) | |

---

## TRIAL OPINION

---

At its core, this dispute is simple: the parties disagree which is the true owner of approximately 111 acres of land located off Interstate 75 in Ringgold, Georgia. To hold that Defendant Kelvin Roberts owns the land, the Court would have to find that Plaintiff Justin Bandy sold the land to Roberts for a mere $31,000. Such a finding is quite implausible and inconsistent with Roberts's testimony at trial and evidence he created at the time of the parties' dealings. Instead, the ultimate transaction at issue was a loan with real estate as collateral—not an outright sale of property. And, because Roberts refused Bandy's timely repayment of the loan, the land remains Bandy's, despite Roberts's attempts in real time and at trial to obfuscate and to frustrate the parties' intent.

## I.    FINDINGS OF FACT

### A.    Background

Bandy inherited 111.4 acres of land in and around Ringgold, Georgia, near Interstate 75 ("the Acreage"). (Doc. 55, at 5.) He did not finish high school, presented in court as notably unsophisticated in financial matters, and earns less than $20,000 annually finishing concrete and

performing manual labor. (Doc. 61, at 69, 73, 87.) Bandy hoped to use a portion of the Acreage to start a tire and alignment shop, but he could not obtain necessary funding through conventional means. (*Id.* at 149–50.)

Enter Roberts, a Tennessee businessman and self-described "hard-money lender"; he offers loans secured by real property valued at no less than double the loan amount, with the goal of maximizing his profits and minimizing his risk. (Doc. 62, at 44, 49, 55–56, 140.) Bandy, inspired by a tip his mother-in-law picked up from her hairdresser and passed to him, approached Roberts and asked for a $130,000 loan to start the shop. (*Id.* at 87–88.) The two agreed the Acreage would secure the loan. (Doc. 55, at 5; Ex. 26.) Roberts believed the Acreage was worth between $200,000 and $300,000 total, and Bandy believed it was worth from $1 million to $1.5 million. (Doc. 62, at 44; Doc. 61, at 85.)

## B.    First Loan

On or about November 25, 2015, at First Title Insurance Company in Chattanooga, Tennessee ("First Title"), Roberts and Bandy executed a $130,000 installment-note loan with a final balloon payment due one year later (the "First Loan"). (Ex. 27; Doc. 61, at 151.) As collateral, Bandy executed a Georgia Deed to Secure Debt, as well as a quitclaim deed for the Acreage dated November 25, 2015. (Ex. 26.) Although Roberts received the signed quitclaim deed, he did not record it. (Doc. 55, at 5.)

As a part of closing this loan, Bandy signed a document prepared by a First Title agent "to give a statement of actual settlement costs" incurred by Roberts. (Ex. 18, at 1.) Above Bandy's signature on the settlement statement was an attestation providing:

> I HAVE CAREFULLY REVIEWED THE HUD-1 SETTLEMENT
> STATEMENT AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT
> IS A TRUE AND ACCURATE STATEMENT OF ALL RECEIPTS AND
> DISBURSEMENTS MADE ON MY ACCOUNT OR BY ME IN THIS

2

TRANSACTION.  I FURTHER CERTIFY THAT I HAVE RECEIVED A COPY
OF THE HUD-1 SETTLEMENT STATEMENT.

(*Id.*)  Roberts charged Bandy twelve-percent interest on the First Loan, as well as a pair of

$6,500 fees (an "origination fee" and a "set up fee"), which were deducted from the loan amount

Bandy received.  (Doc. 55, at 5.)  Roberts testified that he routinely charged ten percent in fees

on all his loans just "to do business with [him]."  (Doc. 62, at 61, 90.)  Roberts's son, Nicholas

Roberts, received these fees from the First Loan despite doing nothing to earn them.  (*Id.* at 58–

61; Doc. 55, at 5.)  Roberts deducted an additional $2,629.38 from the loan amount for title

charges and government recording and transfer charges.[1]  (Ex. 18, at 2.)  Bandy ultimately

received a disbursement of only $114,370.62 in loan proceeds on December 14, 2015.  (Doc. 55,

at 5.)

The interest rate and deductions, as well as the ultimate disbursement amount Bandy was

to receive, clearly appeared in the settlement statement Bandy signed.  (Ex. 18, at 1–2.)  Despite

the attestation and his signature, however, Bandy did not carefully review the settlement

statement; he "just looked over it" and did not notice the charges.  (Doc. 61, at 92–94.)  Roberts

did no due diligence regarding the Acreage or Bandy's creditworthiness other than looking at the

county tax record, as was his practice on all his loans.  (Doc. 62, at 43–44, 54–55; Ex. 12, at 3–

4.)

**C.      Second Loan**

By 2016, Bandy needed additional funds, so he approached Roberts again.  (Doc. 55, at

5.)  On November 1, 2016, again at First Title in Chattanooga, Roberts and Bandy agreed to an

---

[1] This amount consists of:  (1) $275 to First Title for a "settlement or closing fee," (2) $100 to
First Title for "document preparation," (3) $884 for title insurance, (4) $18 in recording fees, (5)
$390 in state taxes, and (6) $962.38 in county taxes.  (Ex. 18, at 2.)

additional $45,000 loan (the "Second Loan"). (*Id.*; Ex. 17; Doc. 61, at 95.) Bandy signed a second "installment note with balloon payment" contract to execute the Second Loan, which seemingly combined the $45,000 Second Loan with the $130,000 First Loan, or amended the First Loan, for a total loan amount of $175,000. (Ex. 17.) The contract stated, "**FOR VALUE RECEIVED**, the undersigned promises to pay to the order of **KELVIN D. ROBERTS**, the sum of **One Hundred Seventy Five Thousand and 00/10 [sic] Dollars ($175,000.00)**, with interest thereon at **Twelve (12%) percent** per annum until paid." (*Id.* at 1 (emphasis original).) However, the contract also provided that "should any one of said interest only payments remain due and unpaid for thirty (30) days, then the remaining installments of this note and interest may be treated as due and payable." (*Id.*) At the time Bandy signed this contract, he was at least two months behind on interest payments on the First Loan. (Doc. 61, at 168; Doc. 62, at 130–31.)

As he did for the First Loan, Bandy signed another Georgia Deed to Secure Debt as to the Acreage. (Ex. 16; Doc. 55, at 6.) This time, however, the deed to secure debt also included Bandy's home as additional collateral for the loan. (Ex. 16, at 6.) Bandy and Roberts also agreed that the quitclaim deed to the Acreage that Bandy signed for the First Loan still secured the Second Loan. (Doc. 55, at 6.)

Although the face amount of the Second Loan was $45,000, Bandy ultimately received a check for only $15,186.30 from Roberts for the Second Loan. (Doc. 55, at 6.) To arrive at this diminished figure, Roberts charged Bandy another ten percent "origination" fee of $4,500, an unspecified amount of fees to First Title, $18 in recording fees, $390 in transfer taxes, an unspecified amount of past-due property taxes paid to Catoosa County, an unspecified amount of past-due interest only payments on the First Loan and corresponding late fees, and the equivalent

of eighteen anticipated interest payments for a total deduction of $25,313.70.[2] (Ex. 12, at 2–3; Doc. 61, at 96–97; Doc. 62, at 131–32.) The $15,186.30 check is dated "11-8-2016," meaning that Roberts issued it seven days after Bandy signed the Second Loan documents at First Title. (Ex. 12, at 65; Ex. 17, at 2.)

Bandy did not clearly testify whether Roberts informed him that he would be deducting this amount before or after he signed the Second Loan contract. (*See* Doc. 61, at 96–97, 169, 174.) The Court finds it more likely than not that Bandy knew before he agreed to the Second Loan that these amounts would be deducted from the disbursement he received. First, the non-interest deductions for taxes, fees to First Title, and local government fees were consistent with those charged in the First Loan and plainly specified on the First Loan's settlement statement. (*See* Ex. 12, at 2–3; Ex. 18.) Second, when asked "[n]ow, [on] November 1, you go and you sign the papers and Mr. Roberts makes you prepay the interest. Is that right[,]" Bandy responded, "[y]es," suggesting that he knew about the interest deductions on the same date he signed the loan contract. (Doc. 61, at 174.) Third, Roberts testified that he only agreed to loan Bandy the additional amount contingent on his prepaying interest because Bandy had gotten behind on interest payments on the First Loan. (Doc. 62, at 132.) The Court finds this testimony credible because Bandy does not dispute that he was behind on interest payments from the First Loan,

---

[2] While Roberts never specified the amount of several of these deductions, the total deducted amount does not compute with what he purports to have charged. Most notably, Roberts stated in an interrogatory answer that he arrived at the diminished amount, in part, by deducting "12% interest payable at $1800.07 per month per the loan agreement. Because of the bad payment history during the term of the first loan, Mr. Roberts required Borrower to pre-pay the interest for the second loan." (Ex. 12, at 2–3.) If Roberts truly deducted all of the interest payments for the eighteen-month term of the loan at the rate of $1,800.07 per month, the interest deduction would have totaled $32,401.26—about $7,000 more than the total amount Roberts deducted, excluding the origination fee. Nonetheless, the Court finds that Bandy knew Roberts would pre-deduct interest in an amount of *at least* $25,313.70.

and Bandy simply could not recall whether Roberts told him about pre-deducting interest before signing the contract.  (Doc. 61, at 167–68.)  Further, when asked "[s]o at the same time that you're asking him for more money, you're behind at least two months on – on your first loan. So it makes sense that he would want to have you prepay those – that interest, right[,]" Bandy responded "[y]es."  (*Id.* at 168.)  Finally, Bandy testified that Roberts told him, at some point, that the amount of the check was lower than the face amount of the loan because he had pre-deducted the interest payments for eighteen months so Bandy would not have to make monthly interest payments and risk getting behind.  (*Id.* at 96–97.)  This evidence, taken together, supports the Court's finding that, on the Second Loan, Roberts was not attempting to hide the deductions from Bandy and Bandy knew of and agreed to these deductions before signing the loan contract.

## D. Land Sale to the Odinets

During this time, Bandy requested a survey of a portion of the Acreage, resulting in the designation of two lots—Lot 1 and Lot 2.  (Doc. 55, at 5.)  Together, Lots 1 and 2 totaled just three acres.  Using funds from the First Loan from Roberts, Bandy had constructed a building for his tire and alignment shop on Lot 2.  (Doc. 61, at 91.)  Bandy's business never got off the ground, however, and he decided to sell Lot 2 so he could repay Roberts on the First Loan and Second Loan.  (*Id.* at 97–101.)  To this end, Roberts referred Bandy to a Chattanooga realtor, Anne Najjar, to help him sell Lot 2.  (*Id.* at 98.)  Najjar introduced Bandy to Vladimir and Oleg Odinets, who agreed on April 24, 2017, to purchase Lot 2 (including Bandy's new building) for $200,000.  (*Id.* at 100–01; Ex. 6.)  The sale of Lot 2 closed on May 26, 2017.  (Doc. 55, at 6.)  Of the $200,000 proceeds from the sale of Lot 2, $179,980.40 went to Roberts, which completely paid off the First and Second Loans.  (*Id.*; Doc. 61, at 106; Doc. 62, at 75.)  After this payment to

Roberts and other transaction expenses, Bandy received nothing from the sale but was free and clear of any further loan obligations to Roberts.[3]  (Ex. 15, at 1; Doc. 61, at 106; Doc. 62, at 75.)

During the course of their interactions about Lot 2, on April 24, 2017, the Odinets also agreed to purchase Lot 1 from Bandy for $70,000.  (Doc. 55, at 6.)  This time, however, Bandy agreed to give the Odinets eighteen months to close the sale after a ten-day inspection period, i.e., November 4, 2018.  (Ex. 7, at 2–3.)  But Bandy apparently needed funds sooner, and, therefore, had reason to deal with Roberts a third time.

### E.    Third Loan

In May 2017—the same month Bandy sold Lot 2 to the Odinets but walked away with nothing after paying Roberts—Bandy and Roberts discussed a third transaction to provide Bandy funds before the Odinets closed on Lot 1.  (Doc. 55, at 6.)  Bandy contends that on June 9, 2017, Roberts agreed to loan him $70,000 for a period of eighteen months.  (Doc. 67, at 6.)  Roberts, however, contends that he refused to loan Bandy more money, and instead bought the entire Acreage from Bandy for $31,000 with an option for Bandy to buy it back for $70,000 in the future.  (Doc. 70, at 12–13.)  Roberts maintains that the eighteen-month period Bandy had to exercise his option to buy back the property somehow ran from the date the Odinets contracted with Bandy for the sale of Lot 2, April 24, 2017, rather than the date Bandy and Roberts entered this transaction, June 9, 2017.  (*Id.* at 15.)  For the following reasons, the Court credits Bandy's

---

[3] At one point Roberts testified, "[t]echnically [Bandy] owed me a few thousand dollars [after the sale of Lot 2].  I just did a partial release to reduce it, just to – to try to close it to help him out, but I never planned on collecting it."  (Doc. 62, at 75.)  But then, on a direct question whether he completely discharged the First and Second Loans when he received payment from the sale of Lot 2, Roberts admitted, "Yes, I closed it out."  (*Id.*)

7

testimony and finds that this transaction was a loan, not a sale, and that Bandy had eighteen months from the date he entered this loan contract, June 9, 2017, to pay it back.

### i.    *The Nature of the Transaction*

Knowing Bandy had received nothing from the sale of Lot 2, Roberts offered to front Bandy the Odinets' $70,000 Lot 1 purchase price as a loan. (Doc. 61, at 110–11.) Roberts knew Bandy was likely to default on a new loan, and, as he would acknowledge later to Eric Scott Smith, hoped to take the Acreage as a result. (*Id.* at 46–49; Doc. 62, at 63, 76, 86.) On or about June 9, 2017, Roberts agreed to loan Bandy $70,000 for a period of eighteen months (the "Third Loan"). The parties agree that Roberts told Bandy that the Third Loan would be "like a title pawn deal": "You give me the title to your land, and I'll give it back to you whenever the loan's paid."[4] (Doc. 61, at 88, 97–98, 152, 173; Doc. 62, at 81.) Nonetheless, Roberts now conveniently maintains that the transaction was actually a *sale* of the Acreage, with an option for Bandy to buy it back within eighteen months. (Doc. 62, at 84.) Nothing written memorializes such terms relating to the Third Loan. (Doc. 55, at 6.) Just as before, Bandy signed a quitclaim deed for the Acreage and received the loan proceeds at First Title in Chattanooga. (Ex. 14; Doc. 62, at 8.) But—unlike prior transactions—Roberts wasted no time and recorded this quitclaim deed on or about June 14, 2017. (Doc. 55, at 7.)

Roberts performed no due diligence or other services as a part of issuing the Third Loan, and he did not actually incur any legal fees. (Doc. 62 at 43, 54–55, 95–96; Ex. 12, at 3.) Ultimately, Bandy received only $31,000 in connection with the Third Loan. (Doc. 55, at 7.) Bandy testified that he expected the full $70,000, called Roberts after the closing to ask why the

---

[4] This description of the deal comes from Bandy's testimony, but Roberts admitted that he told Bandy it would be a "title pawn type transaction" and that he understood a title-pawn transaction to operate the same way as Bandy described it. (Doc. 62, at 81–82.)

check was for only $31,000, and received Roberts's explanation that he had deducted interest prospectively. (Doc. 61, at 115.) Bandy did ultimately deposit the check for the Third Loan—despite it being for $39,000 less than he expected to receive—but would not have done so if it had been payment for an outright sale of his Acreage. (*Id.* at 114–15.) Roberts, by contrast, testified that Bandy knew he would receive only $31,000 at closing, that Bandy watched Roberts write the check, and that Roberts wrote "land purchase" in the check's memo line. (Doc. 62, at 135–36; Ex. 12, at 93.) The Court credits Bandy's version of the events as accurate and trustworthy.

Roberts cannot obscure the true nature of the transaction with the fig leaf of his self-serving memo-line entry. Roberts's own contemporaneous notes regarding the Third Loan are entirely consistently with Bandy's understanding of the deal. (Ex. 13, at 3.) In those notes, Roberts attributes the difference between the $70,000 and $31,000 amounts to charges for a "loan origination" fee and eighteen months of prepaid interest through December 2018, similar to the structure of the Second Loan. (*Id.*) The deduction for prepaid interest totaled $12,600 at a rate of twelve percent per annum. (*Id.*) Roberts created this "deal sheet" detailing the terms of the Third Loan in June 2017, two months after the Odinets contracted with Bandy for the sale of Lot 1 but just before the parties executed the Third Loan. (Doc. 62, at 86–89.) And, consistent with Roberts's written description of the Third Loan, he admitted at trial that he described it to Bandy as similar to a title-pawn deal.[5] (*Id.* at 81–84.)

---

[5] The types of transactions popularly described as "title pawns" are loans, not sales. *See e.g.*, Tenn. Code Ann. § 45-15-103(5) ("'Title pledge agreement' means a thirty-day written agreement whereby a title pledge lender agrees to make a loan of money to a pledgor, and the pledgor agrees to give the title pledge lender a security interest in unencumbered titled personal property owned by the pledgor."); Tenn. Op. Att'y Gen. No. 05-111 (July 12, 2005) (defining "title pawn" transactions by the terms of Tenn. Code Ann. § 45-15-101, *et seq.*, governing "title

Roberts's post-litigation version of these events differs sharply with his contemporaneous notes and his characterizations of the deal to Bandy. Despite his notes confirming interest charges and loans fees, and despite admitting he described the transaction as a "title pawn deal," Roberts now claims it was actually a land-sale contract for the entire Acreage[6] for $31,000 with an option for Bandy to buy it back for $70,000. (Doc. 70, at 13–15; Doc. 62, at 84 ("I told Mr. Bandy that he would deed the property to me, then he would have an option to buy it back for $70,000 at a date in the future, and I would deed it back to him at that time.").)

The Court finds Bandy's testimony much more credible than Roberts's testimony for several reasons. First, Roberts's demeanor and expression on the witness stand did not inspire confidence in his testimony. Second, the evidence—much of which Roberts created—establishes that Roberts merely made another loan secured by the Acreage; he did not purchase it. (*See* Ex. 13; Doc. 61, at 88, 97–98, 152, 173; Doc. 62, at 81–84, 86–89.) He described the transaction to Bandy as a loan, and he described it privately in his own notes no differently. (Doc. 62, at 81–84; Ex. 13.) Third, Roberts's testimony about the closing of the Odinets' purchase of Lot 1 was inconsistent with a sale of the Acreage from Bandy to Roberts but entirely

---

pledge lenders" and "title pledge agreements"); Ga. Code Ann. § 44-12-130 ("'Pawn transaction' means any loan on the security of pledged goods or any purchase of pledged goods on the condition that the pledged goods may be redeemed or repurchased by the pledgor or seller for a fixed price within a fixed period of time."); *In re Hamilton*, 635 B.R. 877, 884 (Bankr. S.D. Ga. 2022) (holding that Ga. Code Ann. § 44-12-130, *et seq*. applies to "title pawn" transactions); Michael H. Anderson, *An Economic Perspective on Subprime Lending*, 89 CHI.-KENT L. REV. 53, 61 (2014) ("A title pawn loan, or title loan, is a loan against the equity in one's vehicle. These loans range from small amounts borrowed for short periods of time, for example, $300 for thirty days, to much larger and longer term loans such as, $5000 for a year or more. For regulatory purposes, these loans may be classified as pawn loans . . . .").

[6] The Acreage at this point no longer included Lot 2, the sale of which to the Odinets had already closed. (Doc. 55, at 6.) But it still included Lot 1, which was under contract between Bandy and the Odinets but had not yet closed. (*Id.*) Therefore, the remaining Acreage Roberts claimed that Bandy sold to him for $31,000 was just under 110 acres of land.

consistent with a loan. When the Court asked him directly, "What was to be done with the proceeds from that sale [of Lot 1 to the Odinets]," Roberts testified that the $70,000 proceeds from the Odinets, minus the realtors' fee, was "what I was going to get to just release it and give [Bandy] his land back." (Doc. 62, at 146–47.) This description is consistent with a title-pawn-style *loan*. (*Id.*) His attempts to explain away the clear indications that the deal was a loan and not a sale were particularly unfulfilling in real time. He testified that he arrived at a $31,000 "sale" amount by deducting a loan-origination fee, eighteen months of interest at a twelve-percent rate, and unspecified "legal fees" from the $70,000 proceeds Bandy expected to receive from the sale of Lot 1. (*Id.* at 94–96, 121.) Roberts could only explain such deductions, which Bandy would not have incurred in a sale, by stating he was "trying to figure out a deal for Mr. Bandy." (*Id.*) His sophistication and experience—if his story were credible—would have resulted in a more coherent view of events. The Court finds the agreement was for a Third Loan, not a sale.

### ii.    *Deadline for Repayment of the Third Loan*

Roberts further contends that the time for Bandy to repay him on the Third Loan expired. (*Id.* at 135.) Despite his contemporaneous notes charging eighteen months of interest *through December 2018*—which is eighteen months from June 2017 when Bandy and Roberts entered the Third Loan transaction—Roberts claims that the eighteen months ran from April 2017, when Bandy and the Odinets entered the sales contract for Lot 1. (Doc. 70, at 26.) The Court, however, finds that Roberts's assertion is not credible.

Bandy understood that he had eighteen months to repay Roberts for the Third Loan from June 9, 2017, the time he signed the quitclaim deed and received the $31,000. (Doc. 62, at 25–27.) Accordingly, his deadline to repay the loan would have been December 9, 2018. Roberts,

on the other hand, discordantly contends that Bandy had eighteen months to repay the Third Loan from the date Bandy's contract with the Odinets for the sale of Lot 1 became an executed agreement, on April 24, 2017. (*Id.* at 87, 135.) If the eighteen-month period ran from the execution of Bandy's and the Odinets' sale contract—a contract to which Roberts was not a party—the deadline for Bandy to repay the Third Loan would have been November 4, 2018.[7] (*Id.* at 144.) Bandy did not attempt to repay the Third Loan until November 5, 2018. (Doc. 55, at 7.)

There is no evidence, however, except for one statement by Roberts at the very end of his testimony which he made *only* in response to a direct question by the Court, that Roberts had ever told Bandy his eighteen months to repay him ran from the contract date on the sale of Lot 1, and not eighteen months from the time the parties executed the Third Loan. (Doc. 62, at 146–47.) The Court ultimately finds it unlikely that the parties agreed that Bandy's contract with a third party, the Odinets, would govern the amount of time he had to pay back the *separate* Third Loan with Roberts. Roberts might have assumed that if the Odinets were not able to close in time that Bandy would not be able to pay him back, but there is no credible evidence to suggest that Bandy's time for repayment to Roberts ran from his contract date with the Odinets or that Roberts ever informed him of such. Roberts's assertions to the contrary are not credible.

---

[7] Bandy and the Odinets executed the contract for the sale of Lot 1 on April 24, 2017. (Ex. 7, at 6.) Eighteen months after that date would have been October 24, 2018. Roberts testified that October 24, 2018, was the date by which he believed he needed to receive proceeds from Bandy to redeem the Acreage. (Doc. 62, at 135.) However, Bandy's post-trial position is that the deadline was actually November 4, 2018, because the contract for the sale of Lot 1 allowed for closing eighteen months after a ten-day inspection period after the contract-execution dates. (Doc. 70, at 20; Ex. 7, at 2–3.) In any event, Roberts contends, the sale did not close, and Bandy did not attempt to repay him, until this period had already expired.

Notably, even Roberts's own calculation of the deal in which he extracted interest up front supports this conclusion, because he charged Bandy *through December 2018*. (Ex. 13, at 3.) Roberts testified at trial that this deduction does not represent interest, but this is in direct contradiction to his deposition testimony, and his testimony is not credible. (Doc. 62, at 98.) The Court finds that Bandy and Roberts agreed that Bandy had until December 9, 2018, to repay the Third Loan.

### iii. *Roberts's Intent to Take the Acreage in Issuing the Third Loan*

Finally, the Court finds that Roberts clearly believed that Bandy was never going to be able to repay him for the Third Loan. Roberts testified that, at the time he agreed to the Third Loan, he knew Bandy was not a good credit risk, that he was "probably broke," that he assumed Bandy would default, and that he knew that if Bandy did not repay him he would be able to take the Acreage. (*Id.* at 56, 63, 76, 78–80, 86.) Further, Roberts knew that the Odinets wanted to buy Lot 1 and, *shortly before the planned November 5, 2018 closing*, offered to let them make another purchase offer to him in January 2019. (*Id.* at 106–08; Ex. 23, at 2–3.) This evidence supports the Court's finding that that Roberts knew the Third Loan with Bandy was a loan, and he knew that Bandy had eighteen months from June 2017 to pay off the loan—until December 2018. Furthermore, even if Roberts were sincerely operating under the impression that the repayment deadline was November 4, 2018, he had already begun undermining Bandy's ability to perform through this undisclosed offer to the Odinets and by refusing to take Najjar's calls regarding the deal as of November 2, 2018. (Ex. 23; Ex. 10, at 6; Doc. 62, at 165.) Offering to allow the Odinets to buy the property in January 2019 and undermining the performance of their contract with Bandy in November 2018 would ensure Bandy would default on the loan, giving Roberts the opportunity to take the entire Acreage and immediately flip it for an incredible profit.

### F.    Lot 1 Sale Closing

Roberts knew that Bandy had to rely on the proceeds of the sale of Lot 1 to the Odinets to repay the Third Loan.  (Doc. 61, at 111, 195; Doc. 62, at 88.)  With knowledge of Bandy's desperation and with a superficial claim to ownership of Lot 1, Roberts took action to prevent Bandy from repaying the Third Loan.  Roberts did not advise Bandy of a planned November 5, 2018 closing of the sale of Lot 1 to the Odinets at the offices of a Chattanooga title company. (Doc. 55, at 7.)  However, Bandy knew the deadline to close on the sale to the Odinets was near, and the December deadline to repay his loan to Roberts was approaching, so on November 2, 2018, Bandy stopped by the Odinets' store on Lot 2 to ask whether they had heard anything about a closing.  (*Id.*)  The Odinets informed Bandy that the closing was to be held in three days. (*Id.*)

When Bandy reached out to Najjar to ask about the closing, she told Bandy that Roberts was the current owner of the property, so her only obligation was to deal with Roberts and the Odinets.  (Doc. 61, at 124–25.)  Although Bandy did not immediately contest Najjar's assertion (*id.*), the Court finds that Bandy at *most* believed that Roberts "owned" the property in a sense consistent with the "title pawn" Roberts had described to him and reasonably expected to retain the Acreage once Lot 1 sold and Roberts received payment satisfying Bandy's debt.  (*See id.* at 88, 97–98, 152, 173.)  As detailed above, the testimony at trial supports this finding.  (*See id.*) For instance, Bandy testified that the entire process of signing the necessary papers and receiving his check for the Third Loan took approximately five minutes, that he did not know what a quitclaim deed was or did, and that he did not know he was signing over title to his property when he signed the quitclaim deed.  (*Id.* at 112, 142–43.)  Further, Roberts directed Najjar to put together an amendment to the agreement for the sale of Lot 1 that would have changed the seller

of Lot 1 from Bandy to Roberts, but Bandy never signed the amendment even though Najjar attempted to get him to sign it. (*Id.* at 120–23; Doc. 62, at 156–57; Ex. 8; Ex. 35, at 19–20.)[8] Bandy's behavior was consistent with someone scrambling to repay a debt in order to redeem collateral; Roberts's behavior was consistent with a loan shark trying to avoid that outcome.

Prior to the closing of Lot 1, Roberts was repeatedly notified of the time and date when it would occur. (Doc. 61, at 140–41; Doc. 62, at 115–16; Ex. 41.) Najjar tried multiple times to get in touch with Roberts prior to the closing and believed that Roberts could be in default on the contract for the sale of Lot 1 if he did not show up to close. (Doc. 62, at 171; Ex. 10, at 10–12.) Roberts admitted at trial that he received Najjar's messages, but he did not respond. (Doc. 62, at 116–17; Ex. 41.) Instead, shortly before closing, Roberts indicated that he would not attend to receive repayment for the Third Loan, despite testifying that he previously intended to "honor" Bandy's contract with the Odinets after he recorded the quitclaim deed. (Doc. 55, at 7; Doc. 62, at 101.) Because he now maintained the deadline for that closing was the same deadline for Bandy to pay him back—November 4, 2022, the day before the closing—Roberts concluded that the Odinets had not timely closed on the sale of Lot 1 and therefore they could not buy Lot 1 from Bandy. (Doc. 70, at 19–20 (citing Ex. 7); Doc. 62, at 100–03.) Roberts's asserted evolution from a mere holder of collateral (the Acreage) to a full owner who could prevent a sale Bandy desired and needed to retain the Acreage—a sale, in fact, that both Bandy and Roberts intended and expected to be Bandy's only means of repaying the Third Loan from the moment the Third Loan was made—was inconsistent with the parties' agreement in the Third Loan.

---

[8] Najjar sent Bandy the amendment through Dotloop, the software that he had successfully used to sign previous contracts with Roberts. (Doc. 62, at 174–75.) Roberts never discussed the amendment with Bandy. (*Id.* at 101–02.)

If Roberts would have been satisfied with Bandy's full performance of the Third Loan, he could have received it. Eric Scott Smith was an extremely credible and personally disinterested witness who lent invaluable insight into Roberts's intent regarding his transactions with Bandy. Smith is an experienced family banker in Ringgold, Georgia, and helps run the Wes and Shirley Smith Charitable Endowment. (Doc. 61, at 36–37.) Smith received a call shortly before the November 5 closing from Bandy's friend, Jamie Sexton. (*Id.* at 39.) Sexton asked Smith to front the repayment of the Third Loan on behalf of Bandy, fearing that, otherwise, Bandy would lose the Acreage to Roberts. (*Id.*)

Smith went to the Lot 1 closing on November 5, 2018, willing and able to write a personal check to cover whatever amount was needed to fully retire the Third Loan so that Bandy would not lose ownership of the Acreage. (*Id.* at 41.) Smith attended the closing of Lot 1 without any expectation that Bandy could pay him back. (*Id.* at 40–41.) Present at the closing were Smith, Bandy, the Odinets, Najjar, and a title attorney, and everyone was willing and able to close. (*Id.* at 41–42.) When the closing stalled because Roberts failed to show, Smith pressed as to why they could not complete the closing without him. (*Id.* at 42–43.) The title attorney then showed Smith the recorded quitclaim deed. (*Id.*) Smith testified that everyone except the attorney was "shocked" to see the quitclaim deed. (*Id.* at 60.) He decided he would not be able to help Bandy on that day, because Roberts had recorded a quitclaim deed for the property Bandy was trying to sell, and so he left the closing. (*Id.*)

Roberts argues that Bandy knew prior to closing that the Odinets did not want to pay the full $70,000 contract amount (Ex. 44) due to an easement on the property.[9] (Doc. 70, at 18.)

_____

[9] Bandy cannot recall whether he knew the Odinets intended to pay the contracted-for purchase price, but he and the Odinets did attempt to execute a revised purchase price of $35,000 at

Regardless of how much the Odinets spent purchasing Lot 1, Smith was present to write a check for whatever amount was necessary to fully pay Roberts back—Roberts chose not to show because he did not want to be paid; instead, he wanted the Acreage. (Doc. 61, at 40–41; *see also* Ex. 23, at 2–3; Doc. 61, at 45–46.)

### H. Roberts's Actions After the Failed Lot 1 Closing

In September 2019, after litigation began and mediation failed, Roberts called Smith and asked him in a phone call to step aside from trying to help Bandy. (Doc. 61, at 45–46.) Roberts told Smith that Bandy was going to lose the Acreage "at some point anyway," so he might as well lose it to Roberts. (*Id.* at 47.) Roberts then offered Smith a cut off the sale of the Acreage if Roberts was able to keep the Acreage and sell it, which Smith flatly refused. (*Id.* at 47–48.) These statements offer further support that Roberts intended to find a way to take the Acreage from Bandy, honestly or not, and not to allow Bandy an opportunity to perform in accordance with the terms of the Third Loan. But this incident also suggests that Roberts continued to scheme to take Bandy's Acreage even while this dispute was pending before the Court, rendering his testimony to the contrary untrustworthy.

## II. CHOICE OF LAW

### A. Contract Claims

A federal court sitting in diversity applies the choice-of-law rules of the state in which the Court sits. *Auto-Owners Ins. Co. v. Se. Car Wash Sys.*, 184 F. Supp. 3d 625, 628 n.2 (E.D. Tenn. 2016). To that end, "absent a contractual choice of law provision, Tennessee courts apply the *lex loci* rule to contract causes of action," meaning that "the substantive law of the state in which the

---

closing. (Ex. 19.) This is no excuse, however, for Roberts to waive away the fact that he refused and avoided repayment.

contract was executed governs disputes arising from the contract." *In re Estate of Davis*, 184 S.W.3d 231, 234 (Tenn. Ct. App. 2004). This is merely a presumption, however, as Tennessee courts also consider the intention of the parties, "gathered from the facts and circumstances attending the contract." *Winebrenner v. Godwin*, No. M2017-00270-COA-R3-CV, 2019 WL 1856471, at *3 (Tenn. Ct. App. Apr. 25, 2019) (citing *Deaton v. Vise*, 210 S.W.2d 665, 669 (Tenn. 1948)). To avoid the presumption that *lex loci* applies, it must "clearly appear[] that the contract was entered into in good faith with reference to the law of some other state." *Id.*

Bandy asserts two contract claims based on his loan transactions with Roberts: (1) breach of contract and (2) usury. All three loan contracts were executed at First Title in Chattanooga, and therefore, under the *lex loci* rule, it is presumed that Tennessee law governs these claims. (Doc. 61, at 95, 151; Doc. 62, at 8.) There has been no testimony from either party about that party's intention to select either state's law. There is thus no evidence in the record to overcome the *lex loci* presumption. Roberts points to a provision in the Georgia Deeds to Secure Debt as to the First and Second Loans which state "THIS CONVEYANCE is made under provisions of the existing Code of the State of Georgia to secure a debt (and interest thereon and other indebtedness as described herein." (Exs. 16, 26.) He contends this provision, because it is the *only* statement of intent to select any state's law, militates in favor of applying Georgia law. But the choice-of-law rules in Tennessee are not simply "whatever the parties most clearly intended." Rather, the rule of *lex loci* is presumed and may only be overcome with clear evidence that the parties intended the law of some other state to govern. *See Winebrenner*, 2019 WL 1856471, at *3. This provision in the security deeds is not sufficiently clear evidence to overcome the *lex loci* presumption. (*See* Ex. 16, 26.) The security deeds simply provide that the conveyance must be made under Georgia law. (*Id.*) This is no surprise, because the land is in

Georgia. But the loan contracts themselves do not include any forum selection or choice of law, and the security deeds make no reference to what state's laws should govern contractual *disputes* between the parties, only what law governs the conveyance. (*Id.*) In fact, the deeds also refer to the state of Tennessee, were executed in Tennessee, and notarized in Tennessee. (*Id.*) Therefore, the Court finds that the presumption of *lex loci* applies as to the First and Second Loans.

The Third Loan was based on an oral agreement, the parties did not agree to a choice-of-law provision, and most attendant circumstances point to Tennessee law governing these claims. Roberts is a resident of and loans money from Tennessee, the quitclaim deed for the Third Loan was executed and Bandy received the $31,000 check at First Title in Chattanooga, and the meeting between Bandy and Roberts concerning the terms of the loan took place at First Title in Chattanooga. (Doc. 61, at 95, 151; Doc. 62, at 8, 49.) Further, the $70,000 loan was tied to Bandy's sale of Lot 1 to the Odinets, and that sale was handled by Chattanooga realtor Anne Najjar. (*Id.* at 98.) Bandy's sale contracts with the Odinets also state that they shall be governed by Tennessee law. (Ex. 6, at 6; Ex. 7, at 6.) Even though the Acreage is in Georgia, the loan agreement appears to have been made and performed in Tennessee, and therefore, under *lex loci*, Tennessee law applies.

Bandy also asserts a usury claim against Roberts. While usury is a contract claim, some authority notes a Tennessee "choice of law principle unique in usury cases that parties are presumed to have chosen that law which will uphold the legality of their bargain." *Goodwin Bros. Leasing, Inc. v. H & B Inc.*, 597 S.W.2d 303, 308 (Tenn. 1980). "That law which will lend greatest validity to the transaction will be applied if it is otherwise logically relevant," considering the parties' intent and circumstances. *Goodwin Bros*, 597 S.W.2d at 308.

Here, however, the usury exception does not apply, because nothing indicates that another state's law might lend Roberts' actions greater validity. For a transaction without a written contract, like the Third Loan here,[10] Tennessee law sets the maximum interest rate at ten percent per year. Tenn. Code Ann. § 47-14-103(3). Georgia—the only other state whose law might be relevant—sets the maximum legal rate of interest, absent a written contract, at seven percent per year. O.C.G.A. § 7-4-2(a)(1)(A). Accordingly, the twelve-percent-per-year interest rate Roberts allegedly charged would be usurious under either state's law. Further, a larger portion of the interest Roberts charged would be usurious under Georgia law, so even if the exception did apply, it would militate in favor of applying Tennessee law, where only two percent of the marginal interest was invalid, versus five percent in Georgia.

Finding that *lex loci* applies, and that the usury exception does not, the law of Tennessee will govern each of Bandy's contract claims because the contracts were executed in Tennessee.

### B. Tort Claims

Bandy also asserts four tort claims against Roberts: (1) fraudulent inducement to contract, (2) constructive fraud, (3) conversion, and (4) tortious interference with contractual relations. For tort claims, Tennessee follows the "most significant relationship" test. *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) (citing *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992)).

> Under this approach, "the law of the state *where the injury occurred* will be applied unless some other state has a more significant relationship to the litigation." Tennessee adopted this position "because generally the law of the state where the injury occurred will have the most significant relationship to the litigation." Thus, the most significant relationship "provides a 'default' rule whereby trial courts can apply the law of the place where the injury occurred when each state has an almost equal relationship to the litigation."

---

[10] Bandy only brings a usury claim as to the Third Loan. (Doc. 29, at 21–22.)

*Id.* (emphasis added) (quoting *Hataway*, 830 S.W.2d at 59 (internal citations omitted)).  In assessing a state's relationship to the litigation, courts consider:  (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship of the parties is centered.  *Id.* at 459–60 (citing Restatement (Second) of Conflict of Laws § 145 (1971)).

On Bandy's fraudulent-inducement and constructive-fraud claims, his alleged injury is the financial loss of excessive fees and interest on the Loans.  (*See* Doc. 29, at 14–16.)  This injury occurred in Tennessee.  Bandy received checks for amounts less than the face value of the Loans in Tennessee, and Roberts received and deposited Bandy's allegedly excessive payments on the Loans in Tennessee.  (Doc. 61, at 92–95, 151; Doc. 62, at 43–44; Doc. 55, at 5–7.)  The conduct causing these injuries occurred in Tennessee, where Bandy and Roberts formed the loan contracts, Roberts charged the fees and interest, and Roberts wrote the checks for diminished funds.  (Doc. 55, at 5–7.)  With respect to Bandy's fraud claims as to the Third Loan only, he alleged an additional injury of the loss of his land through Roberts's fraudulent promise to return the quitclaim deed after Bandy's contract with the Odinets closed.  (*See* Doc. 29, at 14–16.)  This additional injury occurred in Georgia, where the land is located.  But the conduct causing the injury—Roberts misrepresenting the nature of the deal and Bandy executing the quitclaim deed—occurred in Tennessee.  (Doc. 62, at 81–82.)

On Bandy's tortious-interference-with-contractual-relations claim, the alleged injury is the deprivation of the proceeds of the sale of Lot 1 to the Odinets.  (*See* Doc. 29, at 18.)  This injury occurred in Tennessee, where the closing on Lot 1 was set to take place and where Bandy would have received the proceeds of the sale.  (Doc. 55, at 7.)  The actions allegedly causing that

injury—namely, the execution of the quitclaim deed to Roberts and his refusal to attend the closing—also occurred in Tennessee. (Doc. 62, at 8, 49.)

On Bandy's conversion claim, the alleged injury is Roberts's intentional exercise of dominion and control over the Acreage in defiance of Bandy's rights. This injury would necessarily take place in Georgia, where the Acreage is located. The action allegedly causing that injury, Roberts's recordation of the quitclaim deed, took place in Georgia.

The other considerations apply equally to all tort claims. Bandy resides in Georgia, while Roberts resides in Tennessee, so this consideration weighs neither for nor against application of Tennessee law. Finally, it does not appear that the relationship of the parties is more closely centered in either state. All of the contracts between the parties were formed and executed in Tennessee, Roberts lent money from Tennessee, and Roberts made his representations to Bandy from Tennessee. (Doc. 61, at 95, 151; Doc. 62, at 8, 49.) However, relevant to all of those contacts with Tennessee is the use and ownership of the Acreage, in Georgia. (Doc. 55, at 5.) Further, the security deeds and quitclaim deeds were Georgia instruments, Bandy reached out to Roberts from Georgia, and the loan funds were used in Georgia, on the Acreage. (*Id.*) Therefore, the final factor also does not militate in favor of application of the law of one state over the other.

Weighing these considerations, the Court finds that Tennessee law governs Bandy's tortious-interference-with-contract and fraud claims, and Georgia law governs Bandy's conversion claim.

## III. CONCLUSIONS OF LAW

Bandy asserts the following claims against Roberts: (1) fraudulent inducement to contract for all three loans; (2) constructive fraud; (3) breach of two loan agreements; (4) tortious interference with contractual relations; (5) conversion; and (6) usury. (Doc. 29, at 14–22.)

### A. Fraudulent Inducement to Contract

Under Tennessee law, the elements of fraudulent inducement to contract are: (1) a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; and (5) an injury resulting from the reliance. *Lamb v. MegaFlight, Inc.*, 26 S.W.3d 627, 630 (Tenn. Ct. App. 2000). "At a minimum, the false statement element of a fraudulent inducement claim 'must embody a promise of future action without the present intention to carry out the promise.'" *Tullahoma Indus., LLC v. Navajo Air, LLC*, No. M2017-00109-COA-R3-CV, 2018 WL 3752305, at *7 (Tenn. Ct. App. Aug. 7, 2018) (quoting *Keith v. Murfreesboro Livestock Market, Inc.*, 780 S.W.2d 751, 754 (Tenn. Ct. App. 1989)). "The essence of fraud is deception." *Lopez v. Taylor*, 195 S.W.3d 627, 634 (Tenn. Ct. App. 2005).[11]

---

[11] The Court determined that Tennessee law governs Bandy's fraudulent-inducement claims because the majority of the alleged injuries occurred in Tennessee and the conduct causing the injuries occurred in Tennessee. *See supra*, Section II.B. However, this was a narrower determination than the choice of law for Bandy's other tort claims because one of the alleged injuries, Bandy's loss of the Acreage, occurred in Georgia. *See supra*, Section II.B. Nevertheless, the law in Georgia governing fraudulent-inducement-to-contract is nearly identical to Tennessee law: "The tort of fraud [including fraudulent inducement] has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." *Stafford v. Gareleck*, 330 Ga. App. 757, 762 (Ga. App. 2015) (*citing Sims v. Bayside Capital, Inc.*, 327 Ga. App. 47, 51 (Ga. App. 2014) (internal citations omitted).) Therefore, Court finds that applying Georgia law would not change the analysis of Roberts's liability on these counts.

###### i.  *First and Second Loans*

For the First and Second Loans, Bandy claims that Roberts misrepresented: (1) a series of fees as necessary charges, despite knowing that he had no rightful entitlement to these fees, and (2) the amount he was actually intending to loan to Bandy.

###### a.  Entitlement to Fees

To support his claim that Roberts misrepresented certain fees as necessary, despite his lack of legal entitlement to them, Bandy relies the following evidence: (1) Roberts's practice was to charge a ten percent fees on all of his loans "to do business with [him]" (Doc. 62, at 61, 90), (2) Roberts did no due diligence whatsoever regarding the Acreage and thus did not earn these fees (*id.* at 43–44, 54–55; Ex. 12, at 3–4), (3) the "origination fee" and "set up fee" were to be paid to Nicholas Roberts, who had nothing to do with the First Loan (Doc. 55, at 5; Doc. 61, at 92–93; Doc. 62, at 59), (4) Kelvin Roberts knew his son had no entitlement to the payments as a part of the First Loan (Doc. 62, at 58–61), and (5) the settlement statement for the First Loan was supposed "to give a statement of actual settlement costs" as incurred by Kelvin Roberts (Ex. 18).

As a threshold matter, Bandy has not proven that Roberts made any false *statement* regarding his entitlement to the fees on the First or Second loan simply based on the fact that Roberts charged the fees and was not legally entitled to them.  Indeed, on cross-examination, Bandy could not identify any false statement Roberts made to him.  (Doc. 61, at 178.)  Nonetheless, the Court finds that the provision in the settlement statement for the First Loan that the fees were "a statement of actual settlement costs" is a false statement of fact material to the transaction because the evidence is undisputed that neither Kelvin nor Nicholas Roberts actually

24

incurred any costs related to the "origination fee" or the "set up fee." (*See* Doc. 62, at 43–44, 54–55, 58–61; Ex. 18.)

However, Bandy did not reasonably rely on this statement under the circumstances. "To determine whether there was reasonable reliance, the Court considers the following factors: (1) the plaintiff's business expertise and sophistication; (2) the existence of a longstanding business or personal relationship between the parties; (3) the availability of the relevant information; (4) the existence of a fiduciary relationship; (5) the concealment of the fraud; (6) the opportunity to discover the fraud; (7) which party initiated the transaction; and (8) the specificity of the misrepresentation." *Fulmer v. Follis*, No. W201702469COAR3CV, 2018 WL 6721248, at *5 (Tenn. Ct. App. Dec. 20, 2018) (quoting *Pitz v. Woodruff*, No. M2003-01849-COA-R3CV, 2004 WL 2951979, at *10 (Tenn. Ct. App. Dec. 17, 2004)) (internal quotations omitted).

While Bandy was unsophisticated in these types of transactions, he had no dealings with Roberts prior to the First Loan so as to justify any unusual level of trust in Roberts's statements, and the information and ability to discover the falsity of this statement was readily available to him. (Doc. 61, at 87–88; Ex. 18.) Bandy testified he did not carefully review the settlement statement and did not notice the charges to Nicholas Roberts, even though they were clearly listed. (*Id.* at 93–94.) The settlement statement was signed by Bandy with an attestation stating that Bandy had "carefully reviewed" the settlement statement and that it was true and accurate. Bandy also testified that he never met Nicholas Roberts, to his knowledge Nicholas had nothing to do with the loan transaction, and he did not think he should have paid the fees to Nicholas Roberts if he did nothing for the transaction. (*Id.* at 92–93.) The relevant information to discover the statement's falsity was available to Bandy at the time he signed the contract: the settlement statement Bandy signed clearly listed the fee amounts and that they were to be paid to

Nicholas Roberts, and Bandy knew that he had not dealt with Nicholas Roberts at all in the transaction and therefore it was likely that Nicholas Roberts did not incur any actual settlement costs. (Ex. 18.) Additionally, the misrepresentation was not specific at all; in fact, it is presented as a generic, nonspecified contract term. (*See id.* at 1.) The Court finds it unlikely that Roberts intended to deceive Bandy with this generic term, but even assuming he did, it would not have been reasonable for Bandy to rely on this nonspecific term in light of the clear description of fees to be paid to Nicholas Roberts, whom he knew had not earned any fees. (*See id.* at 1–2.) Even if reliance were reasonable, Bandy also has not proven that he did, in fact, rely on the false statement—it is unlikely he even read or noticed the false statement given his testimony that he did not carefully review the settlement statement and his inability to identify any false statement made by Roberts. (*Id.* at 92–94, 178.) Therefore, Roberts is not liable for fraudulent inducement to contract with respect to any representation regarding his entitlement to the fees charged.

b. Loan Amounts

With respect to the amount Roberts intended to loan Bandy in connection with the first and second loan, Roberts represented the loan amounts to Bandy as $130,000 and $45,000, but he ultimately only received disbursements of $114,370.52 and $15,186.30, respectively. (Exs. 12, 17, 27, 28; Doc. 61 at 88, 96; Doc. 62 at 62; Doc. 55, at 5–6.) Again, however, Bandy has not proven that Roberts made any false statement of material fact regarding the amount to be disbursed from these loans. "The essence of fraud is deception." *Lopez*, 195 S.W.3d at 634. "Fraud occurs when a person intentionally misrepresents a material fact or intentionally produces a false impression in order to mislead another or to obtain an unfair advantage." *Id.* (citing *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66 (Tenn. 2001)).

Bandy signed the settlement statement on the First Loan, which clearly identified that $13,000.00 would be paid to Nicholas Roberts. (Ex. 18, at 2.) The settlement statement also correctly identified additional expenses charged to Bandy for various title charges, recording fees and transfer taxes as well as 2015 County Property taxes, all of which totaled $2,629.38. (*Id.*) Bandy testified that he did not carefully review the settlement statement and did not notice the charge to Nicholas Roberts. (Doc. 61, at 93–94.) However, because the amounts to be deducted were clearly listed in the settlement statement, the Court concludes that Roberts did not materially misrepresent the amount of the First Loan. (*See* Ex. 18.)

On the Second Loan, there was no settlement statement, but Roberts again charged a ten-percent fee, consistent with what Roberts charged Bandy on the First Loan. (Doc. 55, at 6.) The deductions from the loan principal were greater for the Second Loan because Roberts pre-deducted interest from the loan disbursement because Bandy got behind on interest payments on the First Loan. (Doc. 61, at 96–97; Doc. 62, at 131–32.) The evidence does not support that Roberts was "hiding the ball" with respect to the deductions to be made on the Second Loan. The non-interest tax and fees deductions on the Second Loan were consistent with the terms of the First Loan, which were clearly noted in the settlement statement. (Ex. 12, at 2–3; Ex. 18.) Roberts testified that he only agreed to loan Bandy the additional amount contingent on him prepaying interest since he was behind on his First Loan interest payments. (Doc. 62, at 132.) Bandy testified that he could not recall what Roberts told him about the terms of the loan before he signed the contract but that it made sense that he had to prepay the interest because he was behind on the First Loan interest payments. (Doc. 61, at 168.) Bandy also testified that on November 1, 2016, when he "signed the papers" for the Second Loan, Roberts made him prepay interest. (*Id.* at 174.) While Bandy received the check from Roberts a week after signing the

loan contract, it clearly stated the $15,186.30 amount, and Bandy deposited it. (Ex. 12, at 64–65.)

Indeed, even if Roberts charged only reasonable fees to which he was, in fact, entitled, Bandy still would have received some amount less than the total gross loan amount. Bandy made no showing that Roberts specifically represented that from these loans Bandy would receive a take-home *disbursement* of $130,000 and $45,000. Even if Roberts did make such a representation, Bandy cannot prove that any reliance on such a statement was reasonable under the circumstances, given the clear description of the deductions in the settlement statement he signed on the First Loan, the consistent deductions across both loans, and Bandy's testimony that Roberts told him he would pre-deduct the interest on the Second Loan. (*See* Doc. 61, at 96; Doc. 62, at 131–32; Ex. 18.) Bandy knew of the charges and fees Roberts intended to charge him before he closed but chose to close and then accept the check, notwithstanding those charges. Therefore, the Court finds that Roberts is not liable for fraudulent inducement to contract on the basis of any representation regarding the amount he intended to loan Bandy in the First and Second Loans.

### ii. *Third Loan*

Bandy claims that Roberts made the Third Loan knowing that Bandy could not pay it back and intending to claim the Acreage (used as collateral) as his own. Bandy claims that Roberts falsely represented that the transaction was "like a title pawn deal," wherein Roberts misrepresented his intent to return title to the Acreage if the loan was repaid within eighteen months after June 9, 2017. Bandy argues Roberts then sabotaged the transaction by which he was to receive repayment, the sale of Lot 1 to the Odinets, to ensure he could retain the Acreage.

The Court finds that Roberts's representation that he would return the title to the Acreage if the loan was repaid was a false statement of material fact. Roberts promised a future action—returning the deed upon repayment—with no intention at the time he made it to carry out the promise. *See Tullahoma Indus., LLC* No. M2017-00109-COA-R3-CV, 2018 WL 3752305, at *7. While there is no direct evidence of Roberts's intention whether or not to return or destroy the quitclaim deed at the time he represented that it was "like a title pawn deal," there is more than enough circumstantial evidence to prove by a preponderance of the evidence that Roberts had no intention of following through on that promise. Most notably, unlike prior transactions, Roberts recorded the quitclaim deed just five days after Bandy signed it. (Doc. 55, at 7.) The Court finds that if Roberts intended to return or destroy the quitclaim deed after giving Bandy his eighteen months to repay the loan, he would not have recorded it almost immediately after it was executed. (*See id.*) Further evidence of Roberts's fraudulent intent and knowledge of the representation's falsity is the fact that when Bandy had the opportunity to pay Roberts back by closing on the sale of Lot 1 to the Odinets, Roberts refused to attend the closing and accept repayment. (Doc. 62, at 116–17; Ex. 41.) If he had initially intended to make good on his promise to return the Acreage upon repayment, there would be no reason to later undermine the closing. Roberts's testimony that he "knew" from the prior loans that Bandy could not handle money and assumed he was going to default when he made the Third Loan, and Smith's testimony that Roberts later told him Bandy was going to lose the property and might as well lose it to Roberts, also evince Roberts's fraudulent intent and knowledge of the representation's falsity. (Doc. 61, at 47–49; Doc. 62, at 56, 63, 76, 78–80, 86.)

The evidence also supports Roberts's intent to induce Bandy's reliance on the statement, Bandy's reasonable reliance, and injury resulting from the reliance. The circumstantial evidence

supports that Roberts intended to induce Bandy's reliance on the misrepresentation in order to secure the deed so that he could very soon thereafter record the deed and claim title to the Acreage, which Bandy would not have otherwise given to Roberts for a mere $31,000. (*See* Doc. 61, at 115; Doc. 62, at 63, 86; Doc. 55, at 7.) The circumstances of this loan manifested a reasonable right to rely on the statement, and Bandy reasonably relied on the representation that Roberts would return or destroy the deed upon Bandy paying the loan in full, because this was the third loan Roberts gave Bandy, all on ostensibly similar terms, and Roberts had also required Bandy to sign a quitclaim deed for the previous loans but was given the opportunity to pay off the loans before any deed was recorded. (Doc. 55, at 5–7.) Bandy had no reason to suspect that Roberts would record the deed for this loan and no means of finding out before or at the time he signed the deed that Roberts's statement was false. Relying on the promise that Roberts would return the deed if Bandy paid off the loan, Bandy was injured—he was prepared to pay off the loan but nonetheless lost record title to his land. (Doc. 61, at 41–43.) Accordingly, the Court finds that Roberts is liable for fraudulent inducement with respect to the Third Loan.

### B. Constructive Fraud

Bandy claims that, regardless of whether Roberts intended to defraud him, Roberts's actions deceived him and proximately caused harm to him based on the same fraud theories described in Section III.A., above. Under Tennessee law, constructive fraud is "a breach of a legal or equitable duty which is deemed fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 39–40 (Tenn. Ct. App. 2006). "Constructive fraud is essentially fraud without the element of intent," and it "concern[s] a breach of a legal or equitable duty, with or without

fraudulent intent, and entail[s] as an attribute of fraud, conduct which reasonably can be expected to influence the conduct of others."[12] *Id.*

"The motive of the actor is irrelevant for constructive fraud[, b]ut reliance and damages remain essential elements for a constructive fraud claim." *Vic Davis Constr., Inc. v. Lauren Eng'rs & Constructors, Inc.*, No. E201700844COAR3CV, 2019 WL 1300935, at *6 n.5 (Tenn. Ct. App. Mar. 20, 2019) (citing *Parks v. Alexander*, 608 S.W.2d 881, 891 (Tenn. Ct. App. 1980) (noting that constructive fraud involves conduct "which reasonably can be expected to influence the conduct of others")). The Court has found that Bandy's reliance on any of the alleged false statements of material fact regarding the First and Second Loans was not reasonable, defeating his fraudulent-inducement-to-contract claim. *See supra* Section III.A.i. Because the circumstances did not give rise to a reasonable right to rely on any of the alleged false statements, Bandy's constructive-fraud claim as to the First and Second Loans must also fail. *See Vic Davis Constr.*, 2019 WL 1300935, at *6 n.5. However, because the Court has found that Roberts is liable for fraudulent inducement as to the Third Loan, it is also compelled to find Roberts liable for constructive fraud as to that loan.[13]

---

[12] Again, the Court applies Tennessee law to Bandy's constructive-fraud claim, but this choice of law was a narrow determination. *See supra,* n.11. However, the law in Georgia governing constructive fraud is also very similar to Tennessee law: "Constructive fraud consists in any act of omission or commission contrary to legal or equitable duty, trust or confidence justly reposed, which is contrary to good conscience and operates to the injury of another. *Shipman v. Horizon Corp.*, 245 Ga. 808, 810 n.3 (Ga. 1980). Georgia courts have also found that "[c]onstructive fraud, in contrast to actual fraud, does not require a finding of an intent to deceive." *Lawyers Title Ins. Corp. v. New Freedom Mortg. Corp.*, 285 Ga. App. 22, 25 (Ga. App. 2007). Therefore, the Court again finds that its analysis as to Roberts' liability on this count would not change had it applied Georgia law.

[13] Constructive fraud requires the additional element of "breach of a legal or equitable duty," which is not required to prove fraudulent inducement to contract. Nonetheless, whenever a defendant is liable for fraudulent inducement to contract, he is necessarily also liable for constructive fraud, because the showing of an *intentional* material misrepresentation related to a

31

## C.    Breach of the Loan Agreements

As a threshold matter, Bandy only brings breach-of-contract claims to the extent the loans were not vitiated by his fraud claims.  (Doc. 29, at 17.)  Therefore, the Court will not consider whether Roberts breached the Third Loan agreement, because the Court has already found Roberts liable for fraudulent inducement and constructive fraud as to the Third Loan.  However, because the Court did not find Roberts liable for fraud as to the First and Second Loans, it will now consider whether Roberts breached those contracts.  Bandy argues that Roberts has breached those contracts by failing to lend Bandy the full principal amount promised and by making improper deductions from those principal amounts.  (Doc. 67, at 13–14.)  Bandy specifically asserts that Roberts violated the covenant of good faith and fair dealing implied in all contracts by Tennessee law.  (*Id.*)

Under Tennessee law, the elements of breach of contract are:  (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract.  *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005).  "In construing contracts, courts look to the language of the instrument and to the intention of the parties[] and impose a construction which is fair and reasonable."  *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987) (citing *Covington v.*

---

contract is a breach of the legal fiduciary duty of good faith and fair dealing implied into every contract.  *See Dick Broadcasting Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 673–75 (Tenn. Jan. 17, 2013) (Koch, J., concurring) (finding that breach of the duty of good faith and fair dealing implies either actual or constructive fraud) (quoting *Keller v. Beckenstein*, 979 A.2d 1055, 1063–64 (Conn. App. 2009)); *cf. Greer v. Zolfagharbik*, No. W1999-01013-COA-R3CV, 2001 WL 125946, at *3 (Tenn. Ct. App. Jan. 30, 2001) (considering an argument that a misrepresentation amounted to constructive fraud on the basis of breach of the duty of good faith and fair dealing though ultimately rejecting the argument because there was no material misrepresentation).

*Robinson,* 723 S.W.2d 643, 645–46 (Tenn. App. 1986)). Tennessee law imposes an implied duty of good faith and fair dealing in every contract. *Dick Broad. Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. 2013) (citing *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996)). "The purpose of the implied covenant is two-fold. First, it honors the reasonable expectations of the contracting parties. Second, it protects the rights of the parties to receive the benefits of the agreement into which they entered." *Kinard v. Nationstar Mortg. LLC*, 572 S.W.3d 197, 207–08 (Tenn. Ct. App. 2018) (citing *Lamar Adver. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009)) (internal citations omitted). While the Court has found that this claim is governed by Tennessee law, the reasoning in a Georgia case, *Automatic Sprinkler Corp. of Am. v. Anderson*, 257 S.E.2d 283 (1979), is persuasive and consistent with Tennessee law:

> What the intent of the parties was in making the contract must control; it is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant. There can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do.

*Id.* at 284 (citing *VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F.Supp. 773 (S.D.N.Y. 1969); *MacDougald Constr. Co. v. State Highway Dep't*, 188 S.E.2d 405, 407 (Ga. Ct. App. 1972) (internal citations and quotation marks omitted)).

In this case, the terms of the First Loan contract expressly gave Roberts a right to deduct the fees he did, and the Court has found it more likely than not that Bandy knew about and agreed to the prepaid interest and fee deductions in the Second Loan contract. *See supra* Section III.A.i.; (Ex. 18). Roberts and Bandy agreed to the deductions in the contract, and then reasonably expected that Roberts would pay out a lower disbursement based on those deductions. (*See* Doc. 61, at 96; Doc. 62, at 131–32; Ex. 18.) To find that Roberts breached the contract by

disbursing less than the gross amount of the loans and that he breached his duty of good faith by charging excessive fees and interest would run counter to Tennessee law's mandates to impose a fair and reasonable construction of the contract, uphold the reasonable expectations of the contracting parties, and protect the rights of the parties to receive the benefits of the agreement. *Kinard,* 572 S.W.3d at 207–08. Bandy asks the Court to remedy excessive fees and interest deductions through finding a breach of contract, when the parties' intent was to form a contract explicitly allowing for these fees, and Bandy signed it nonetheless.[14] Therefore, the Court finds Roberts is not liable for breach of contract on the First or Second Loans.

### D. Tortious Interference with Contractual Relations

Bandy claims that Roberts intentionally and maliciously took actions calculated to prevent the sale of Lot 1 to the Odinets from closing to wrongfully claim ownership of the Acreage. Under Tennessee law, the elements of tortious interference with contractual relations are: (1) that a legal contract existed; (2) that the defendant was aware of the contract; (3) that the

---

[14] The after-the-fact remedy available to Bandy for agreeing to such excessive fees and interest is not in breach of that agreement but in usury law. However, Bandy did not bring usury claims on the First and Second Loan, for which there were written contracts, only the Third, which was unwritten. While the fees and interest rates of the First and Second Loans would be usurious under Tennessee law, Georgia law provides that, for loans between $3,000 and $250,000, the parties may establish by *written* contract *any rate* of interest. Ga. Code Ann. § 7-4-2(a)(1)(A); Tenn. Code Ann. §§ 47-14-103(3), 47-14-113(b)–(c). Were the Court to construe Bandy's allegations of excess fees and interest as a claim for usury as to the First and Second Loans, the Court would be compelled by the Tennessee choice-of-law rules to apply Georgia usury law to these transactions because Georgia law is logically relevant and would lend the greatest validity to the transaction, *i.e.*, the interest rate would not be usurious. *Goodwin Bros*, 597 S.W.2d at 308; *see also Norris v. Sigler Daisy Corp.*, 392 S.E.2d 242, 243 (1990) (finding that Georgia's criminal usury law, capping interest at five percent per month in any contract, can be used to seek civil penalties and origination fees are included in its definition of interest). Therefore, even if the Court construed Bandy's breach-of-contract claim as a usury claim, it would likely fail. Further, because Roberts would be rightfully entitled to the interest and fees he charged for these loans under Georgia law, and he followed the explicit terms of the agreements in charging them, Bandy's arguments that Roberts breached his implied duty of good faith and fair dealing by charging "excessive" or "wrongful" interest and fees are unavailing.

34

defendant intended to induce a breach of that contract; (4) that the defendant acted with malice; (5) that a breach of the contract occurred; (6) that the breach was a proximate result of the defendant's conduct; and (7) that the breach injured the plaintiff. *Green v. Champs-Elysees, Inc.*, No. M2012-00082-COA-R3-CV, 2013 WL 10481171, at *7 (Tenn. Ct. App. 2013).

In this case, it is undisputed that Bandy had a legal contract with the Odinets to sell them Lot 1 for $70,000 and that Roberts was aware of the contract. (Doc. 55, at 6; Ex. 8.) The Court finds that Roberts intended to induce a breach of the contract with the Odinets and that he acted with malice. "Legal malice simply means a willful violation of a known right, and as some of the cases have very actively said in a legal sense, malice is nothing more than the absence of justification." *Riggs v. Royal Beauty Supply, Inc.*, 879 S.W.2d 848, 851 (Tenn. Ct. App. 1994) (cleaned up). The Court has found by a preponderance of the evidence that: (1) the Third Loan was indeed a loan, not a sale,[15] (2) Bandy still had time to pay back the loan, (3) Roberts deliberately recorded the quitclaim deed to take the Acreage without justification, knowing he was not yet entitled to it but believing Bandy would inevitably default on the loan, (4) Roberts

---

[15] The Court notes that, in some circumstances, extrinsic evidence regarding the terms of a contract is inadmissible where the contract has been reduced to writing. "Under the parol evidence rule, extrinsic evidence 'is inadmissible to contradict, vary, or alter a written contract where the written instrument is valid, complete, and unambiguous, absent fraud or mistake or any claim or allegation thereof.'" *Ewan v. Hardison L. Firm*, No. W2011-00763-COA-R3CV, 2012 WL 1269148, at *7 (Tenn. Ct. App. Apr. 16, 2012) (quoting *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 259 (Tenn. Ct. App.1990)). Arguably, the quitclaim deed is a complete and unambiguous written instrument memorializing the Third Transaction, and, if no other evidence regarding the transaction were admitted, would suggest the Third Transaction was a sale, not a loan. "However, 'Tennessee law has long recognized several exceptions to the parol evidence rule including allegations of fraud, and the rule does not apply to claims of fraudulent misrepresentation in inducement of a contract.'" *Id.* (quoting *Biancheri v. Johnson,* Nos. M2008–00599–COA–R3–CV & M2007–02861–COA–R3–CV, 2009 WL 723540, at *9 n.9 (Tenn. Ct. App. Mar. 18, 2009)). Bandy has alleged fraud with respect to the nature of the Third Loan. (*See* Doc. 29, at 14–16.) Therefore, the Court properly considered extrinsic evidence of the terms of the contract.

directed Najjar to prepare an amendment to Bandy's land-sale contract with the Odinets substituting Roberts as the seller so that the sale could not close without him (Doc. 61, at 120–23; Ex. 8; Ex. 35, at 19–20), and (5) Roberts refused to show up to the closing, knowing it would fail without his presence so that Bandy could not pay back the loan and Roberts could take the entire Acreage for the mere $31,000 disbursement. *See supra* Sections II.E.–F., III.A.ii*., supra*. These facts demonstrate that Roberts intended to induce a breach of the contract with the Odinets and acted with malice or improper motive to cause the failure of the contract to allow him to take the Acreage from Bandy. *See Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) ("It is clear that a determination of whether a defendant acted 'improperly" or possessed an 'improper' motive is dependent on the particular facts and circumstances of a given case . . . . However, with regard to improper motive, we require that the plaintiff demonstrate that the defendant's predominant purpose was to injure the plaintiff.").

Further, the breach of the land-sale contract with the Odinets did, in fact, occur because Bandy was unable to close on the deal and deliver Lot 1 to the Odinets. (Doc. 61, at 40–43.) The breach was proximately caused by Roberts's conduct because, had Roberts not improperly recorded the quitclaim deed and directed Najjar to substitute himself as the seller, Bandy would have been able to close on the contract. (*See id.*) Finally, the breach injured Bandy because he did not receive the proceeds of the sale and was therefore unable to pay Roberts for the loan, thereby losing his entire Acreage. (*See id.*) Roberts is liable for tortious interference with contractual relations as to Bandy's land-sale contract with the Odinets.

### E.      Conversion

Bandy claims that "through fraud and other misconduct," Roberts misappropriated the Acreage from Bandy and that Bandy has suffered a financial injury in an amount exceeding

$700,000 as a result. The Court has found that Bandy's conversion claim is governed by Georgia law because the alleged injury would have occurred on his land located in Georgia. *See supra* Section II.B. Under Georgia law, the tort of conversion does not apply to real property, but only to personal property and chattels. *Chung v. JP Morgan Chase Bank, NA*, 975 F. Supp. 2d 1333, 1347 (N.D. Ga. 2013) (citing *Levenson v. Word*, 668 S.E.2d 763 (Ga. Ct. App. 2008)). Bandy only claims that Roberts converted the Acreage. (*See* Doc. 67, at 17–18.) Therefore, the Court finds that Roberts is not liable for the tort of conversion.

### F.    Usury

Bandy's usury claim applies only to the third loan of $70,000 and should be governed by the law of Tennessee. Under Tennessee law, usury is "the collection of interest in excess of the maximum amounts authorized by or pursuant to" Tennessee law. Tenn. Code Ann. § 47-14-102(12); *see also Aztec Props., Inc. v. Union Planters Nat. Bank of Memphis*, 530 S.W.2d 756, 757 (Tenn. 1975). The maximum effective rate of interest authorized by Tennessee law for an unwritten contract not governed by any other statute is ten percent per year. Tenn. Code Ann. § 47-14-103(3). In an unwritten contract, the collection of brokerage commissions is limited to "compensation which is fair and reasonable for the services performed," and no other commitment fees or loan charges may validly be imposed. Tenn. Code Ann. § 47-14-113(c)–(e).

The Court has found that, on the Third Loan, Roberts charged Bandy a twelve-percent-per-year interest rate with interest pre-deducted from the loan disbursement, a ten percent "loan designation" or origination fee, charges for various back taxes, and $1,164 for miscellaneous legal fees. (Ex. 13, at 3.) Roberts performed no due diligence or other services as a part of issuing the Third Loan and he did not actually incur any miscellaneous legal fees. (Doc. 62 at 43, 54–55, 95–96; Ex. 12, at 3.) As a result, Bandy has proven that Roberts charged an interest

rate in excess of the maximum rate allowable for this contract under Tennessee law and charged

fees which were not related to any services performed. Therefore, the Court finds Roberts liable

for usury.

## IV. REMEDIES

Bandy seeks an equitable accounting to determine all amounts Roberts misappropriated

from him,[16] rescission of the Third Loan contract, monetary damages for his tortious-interference

and usury claims, a declaratory judgment that the June 2017 Quitclaim Deed is invalid and

unenforceable and that Bandy owns the Acreage in fee simple, permanent injunctive relief

prohibiting Roberts from adversely affecting Bandy's ownership rights in the remaining acreage,

and punitive damages.

### A. Rescission

On Bandy's fraud claims and alternative breach-of-contract claim against Roberts as to

the Third Loan, Bandy seeks equitable relief invalidating the June 6, 2017 quitclaim deed and

ordering Roberts to return the Acreage to Bandy. The Court construes this request as one for

rescission of the Third Loan contract, the non-performance of which allowed Roberts to take the

Acreage. (See Doc. 55, at 4 ("A return of the real property, if awarded by the Court, would act

as a recission [sic] of the June, 2017 deed between the parties.").) "[R]escission is an equitable

remedy that involves setting aside a transaction if, for example, it was induced by fraud or

duress. Rescission 'is not looked upon lightly and will be awarded only under the most

demanding circumstances.'" *Wilson Bank & Tr. v. Consol. Util. Dist. of Rutherford Cnty.*, No.

M202100167COAR3CV, 2022 WL 2092540, at *6 (Tenn. Ct. App. June 10, 2022) (quoting

---

[16] Because the Court has not found Roberts liable for any of Bandy's claims with respect to the First and Second Loans, and because the Court awards the equitable remedy of rescission on the Third Loan contract, the Court will not consider Bandy's request for an equitable accounting.

*Douglas v. Foster*, No. M2000-03177-COA-R3-CV, 2002 WL 83605, at *1 (Tenn. Ct. App. Jan. 22, 2002)) (citing *Lamons v. Chamberlain*, 909 S.W.2d 795, 800 (Tenn. Ct. App. 1993)).  The purpose of rescission is to return the parties to the positions they were in before the transaction took place.  *Williamson v. Upchurch*, 768 S.W.2d 265, 271 (Tenn. App. 1988).  "The decision to grant rescission rests in the sound discretion of the trial court, and if an award of damages would be an adequate remedy, rescission will not be granted."  *Douglas*, 2002 WL 83605, at *1 (internal citations omitted).

The Court has found Roberts liable for fraudulent inducement to contract and constructive fraud with respect to the Third Loan, and such fraud allowed him to improperly claim title to the Acreage.  *See supra* Section III.A.ii–B.  Because of this fraud, an equitable remedy of rescission of the Third Loan contract is available if the Court determines damages would be an inadequate remedy.  *See Wilson Bank*, 2022 WL 2092540, at *6.  In this case, the Court finds that an award of damages for Roberts' fraudulent taking of the Acreage would be inadequate to compensate for the loss of Bandy's unique real estate—his family inheritance.  *See Hillard v. Franklin*, 41 S.W.3d 106, 111 (Tenn. Ct. App. 2000) ("Given that real property is unique, damages are generally deemed an inadequate remedy for breach of real estate contracts, and, accordingly, such contracts are generally eligible for [equitable remedies].").  Accordingly, the Court will award Bandy the equitable remedy of rescission of the Third Loan contract, returning the parties to their original positions prior to making the Third Loan contract.  This remedy shall invalidate the June 6, 2017 quitclaim deed, Roberts shall return the Acreage to Bandy, and Bandy shall return to Roberts the $31,000 disbursement of funds he received as a benefit of the contract.

### B.      Damages

#### i.      *Fraud and Breach of Contract Counts*

In the alternative, Bandy asks the Court to award damages for Roberts's fraud, resulting in the loss of the Acreage, in an amount of $930,000. The election-of-remedies doctrine "prohibits and estops a plaintiff from seeking inconsistent remedies once a clear choice has been made to pursue a specific remedy." *Wimley v. Rudolph*, 931 S.W.2d 513, 515 (Tenn. 1996) (citing *Barger v. Webb*, 216 Tenn. 275, 391 S.W.2d 664 (1965). The sole purpose of the election-of-remedies doctrine is to "prevent double redress for a single wrong." *Rolen v. Wood Presbyterian Home, Inc.*, 174 S.W.3d 158, 162 (Tenn. Ct. App. 2005) (quoting *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901 (Tenn. 1999)). Granting both rescission of the contract—returning the Acreage to Bandy—and damages in the value of the Acreage would create double redress for the single wrong of Roberts's fraud with respect to the Third Loan. *Cascade Ohio, Inc. v. Modern Mach. Corp.*, No. E2009-01948-COA-R3-CV, 2010 WL 4629467, at *13 (Tenn. Ct. App. Nov. 15, 2010) ("A buyer that is damaged by a breach of contract involving a misrepresentation can elect, as late as after the verdict comes in, between rescission of the contract and recovery of the purchase price, or damages."). However, Bandy clearly elected the remedy of rescission by only requesting damages in the alternative to return of the Acreage. (Doc. 66, at 26.) Therefore, because the Court has granted Bandy the equitable remedy of rescission which he elected, it need not consider Bandy's request in the alternative for damages on his fraud claim as to the Third Loan. *See supra* Section IV.A.

Bandy also seeks damages in the amount of $45,543 for either fraud or breach of contract on the First and Second Loans. The Court has found Roberts is not liable for fraud or breach of

contract as to these Loans, so it will not award Bandy these damages. *See supra* Section III.A.–C.

### ii. *Tortious Interference with Contractual Relations*

On his tortious-interference-with-contractual-relations claim, Bandy seeks $117,000 in damages. Under Tennessee law, where a person procures or induces a breach of contract, "the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract." Tenn. Code Ann. § 47-50-109. "This section is a codification of the common law tort action and provides for mandatory treble damages if there is a *clear showing* that the defendant induced the breach." *Shahrdar v. Glob. Hous., Inc.*, 983 S.W.2d 230, 238 (Tenn. Ct. App. 1998) (emphasis original) (citing *Polk & Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 542 (Tenn. 1989)). The Court finds that Bandy has presented clear and convincing evidence that Roberts induced the breach of the land-sale contract with the Odinets by recording the quitclaim deed to the Acreage when he was not entitled to do so, ordering the amendment of the contract to substitute himself as the seller, and refusing to come to the closing of the contract knowing that it would fail and he would be able to take the entire Acreage for a mere $31,000. (*See* Doc. 55, at 7; Doc. 61, at 120–23; Doc. 62, at 116–17; Ex. 8; Ex. 35, at 19–20; Ex. 41.)

Bandy calculates the tortious-interference damages as the contract price, $70,000, less the $31,000 to be repaid to Roberts under the Third Loan contract—$39,000—which, in treble, amounts to $117,000. (Doc. 67, at 21.) However, the measure of damages resulting from the breach of Bandy's contract with the Odinets does need not be discounted by what Bandy owed Roberts under the Third Loan contract—the rights and responsibilities related to that contract are within the purview of other claims. For Bandy's tortious-interference claim, the measure of his

damages is based on what he expected to receive from the contract with the Odinets—$70,000—but did not receive due to Roberts's interference. This is the correct measure of damages regardless of where Bandy might have expected to spend the proceeds of that contract. Therefore, on the tortious-interference claim, the Court will award Bandy treble damages of his expected proceeds on the contract with the Odinets—$210,000.[17]

### iii. Usury

Bandy also seeks damages on his usury claim. "Where usury or excess loan charges, commitment fees or brokerage commissions do not appear on the face of the contract, but are proved [as a defense], only the principal, plus lawful interest, loan charges, commitment fees, and brokerage commissions may be recovered [by the lender]." Tenn. Code Ann. § 47-14-117(b). "Where, however, the court finds that the lender or creditor has been guilty of unconscionable conduct in a transaction by taking interest, loan charges, commitment fees, or brokerage commissions in excess of the limitations fixed by statute, that lender or creditor shall not be entitled to recover any interest, loan charges, commitment fees or brokerage commissions with respect to that transaction, and shall be required to refund to the borrower or debtor any loan charges, commitment fees or brokerage commissions and twice the amount of any interest collected with respect to that transaction, and the borrower shall be entitled to recover reasonable

---

[17] Bandy will not be required to elect between the damages for his tortious-interference claim and the rescission of the Third Loan for his fraud claim because they are predicated on separate contracts. *See Garrett v. Mazda Motors of Am.*, 844 S.W.2d 178, 180 (Tenn. Ct. App. 1992) (holding that remedies "must be truly inconsistent" to require a plaintiff to elect between them). Regardless of the existence or nonexistence of a separate contract between Roberts and Bandy, Bandy would have received $70,000 in proceeds under his sale contract with the Odinets but for Roberts's interference. Arguably, this creates a windfall for Bandy because his only means of repaying the Third Loan was the proceeds of the sale. However, the rescission remedy requires not just that Roberts return of the Acreage, but also requires Bandy return Roberts's consideration for the Loan, $31,000, and voids the contract *ab initio*, preventing any potential windfall.

attorneys' fees from the lender." Tenn. Code Ann. § 47-14-117(c)(1). "'[U]nconscionable conduct' includes, but is not limited to, any calculated violation of statutory limitations on interest, loan charges, commitment fees, or brokerage commissions with full awareness of those limitations." Tenn. Code Ann. § 47-14-117(c)(2).

Here, the Court finds Roberts engaged in unconscionable conduct by devising a scheme through the fraudulent and usurious issuance of a Third Loan to take Bandy's entire Acreage at minimum expense to himself—only $31,000. Arguably, Roberts did not have full awareness of the legal limits on interest and fees. He testified that he knew there were some limits on the amount of interest that can be charged on a loan but that he had never heard the term "usury" before Bandy brought this case. (Doc. 62, at 47; Ex. 36, at 15.) Bandy contends in his reply brief, "[a] hard-money lender claiming ignorance of usury is as credible as a driver claiming ignorance of speed limits." (Doc. 72, at 4.) In any event, however, the statute's definition of "unconscionable conduct" explicitly states it is not limited to knowing violation of the maximum rates. Tenn. Code Ann. § 47-14-117(c). In *Bank of Crockett v. Cullipher*, 752 S.W.2d 84 (Tenn. Ct. App. 1988), the Court of Appeals of Tennessee found that a lender engaged in unconscionable conduct where it devised a late charge with no legal basis to pressure the creditor into paying his notes. 752 S.W.2d at 93. Similarly, in this case, Roberts devised charges he never incurred and imposed an excessive interest rate in order to ensure he would be able to take the Acreage at minimal cost. (Doc. 62, at 43–44, 54–55; Ex. 12, at 3–4.) The Court finds this, too, amounts to unconscionable conduct. Accordingly, Roberts "shall not be entitled to recover any interest, loan charges, commitment fees or brokerage commissions with respect to that transaction, and shall be required to refund to the borrower or debtor any loan charges, commitment fees or brokerage commissions and twice the amount of any interest collected with

respect to that transaction." *See* Tenn. Code Ann. § 47-14-117(c)(1). However, because Bandy never actually paid back the $70,000, including the excessive prepaid interest and fees, these remedies are not appropriate—Bandy never actually paid any interest and fees for Roberts to refund. (See Doc. 61, at 40–43.) Nonetheless, due to Roberts's usury and unconscionable conduct, Bandy "shall be entitled to recover reasonable attorneys' fees from the lender." Tenn. Code Ann. § 47-14-117(c)(1). Accordingly, the Court awards Bandy reasonable attorneys' fees on his usury claim. The Court hereby **SETS** a hearing to determine Bandy's fee award, to be held in Courtroom 3 on **September 15, 2022**, at **10:00 a.m.** at the U.S. Courthouse, 900 Georgia Avenue, Chattanooga, Tennessee. Bandy shall file any documentation to support the amount of attorneys' fees requested no later than **September 8, 2022**. Roberts should be prepared to present any challenge to the requested attorneys'-fee amount and the reasonableness thereof at the hearing.

C.    **Declaratory Judgment**

Bandy seeks a declaratory judgment ordering that: (a) the quitclaim deed executed by Bandy, dated June 9, 2017 is invalid and unenforceable, and (b) Bandy owns the Acreage in fee simple, subject to no claim by Roberts. Roberts claims that Bandy is not entitled to declaratory judgment, because he is not the owner of the real property in question and because the deed that transferred that real property was valid.

The Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201–2202, gives district courts the discretion to hear actions seeking to declare the rights or legal relations of interested parties that fall within its purview. 28 U.S.C. § 2201 ("[I]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration,

whether or not further relief is or could be sought.").  "[F]ederal district courts in particular, have unique and substantial discretion in deciding whether to declare the rights of litigants."  *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 758 (6th Cir. 2014).  The sound administration of that discretion "calls for the exercise of 'judicial discretion, hardened by experience into rule.'"  *Id.* at 759 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289).

Courts should consider the following factors in exercising discretion:  (1) whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for res judicata'; (4) whether the use of a declaratory judgment action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective.  *Pakideh v. Ahadi*, 99 F.Supp.2d 805, 808 (E.D. Mich. 2000) (citing *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 968 (6th Cir. 2000)).

The Court concludes that a declaratory judgment is appropriate in this case because:  (1) it conclusively settles that Bandy owns the Acreage, (2) it clarifies Bandy's rightful ownership and that Roberts has no claim to the land to limit any future chain-of-title confusion, (3) this case is a personal real estate dispute and very unlikely 'to provide an arena for a race for res judicata,' (4) there is little concern over encroachment on state jurisdiction given that this dispute crossed state lines, and (5) a declaratory judgment is the most effective remedy to clearly vest rightful ownership of the property in Bandy.  Therefore, the Court awards Bandy declaratory judgment that the quitclaim deed executed by Bandy, dated June 6, 2017, is void, invalid, and unenforceable, and Bandy owns the Acreage in fee simple, subject to no claim by Roberts.

### D. Injunctive Relief

Bandy seeks a permanent injunction prohibiting Roberts (or anyone acting in concert with him) "from taking any action that would adversely affect Bandy's ownership rights in the Acreage, including prohibiting Roberts (or anyone acting in concert with him) from selling, alienating, encumbering, or transferring any interest in the Acreage." (Doc. 66, at 39.) "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (internal quotation marks omitted).

In this case, Bandy has shown that a permanent injunction is justified. While irreparable injury and inadequate compensation of remedies at law are two separate factors in the analysis, the Sixth Circuit considers them together. *See Caspar v. Snyder*, 77 F. Supp. 3d 616, 640 (E.D. Mich. 2015) ("[T]he hallmark of irreparable injury is the unavailability of money damages to redress the injury.") (citing *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007)). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). In this case, Bandy's injury, *i.e.*, Roberts's fraudulent defiance of Bandy's ownership rights, is not fully compensable by monetary damages,

because such damages do not prevent him from continuing to wrongfully represent his ownership interest in reliance on the fraudulently secured and recorded quitclaim deed. (*See* Doc. 55, at 7.) In order to be made whole, especially in light of Roberts's past conduct, Bandy needs assurance that Roberts will not encumber the Acreage to Bandy's detriment.

Further, balancing the hardships between Bandy and Roberts militates in favor of issuing an equitable remedy because Bandy has shown a reasonable likelihood that Roberts would interfere with the property in the future given Roberts's consistent and malicious scheme to take the Acreage, even during this litigation. *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 332 (6th Cir. 2013) (holding that a permanent injunction is appropriate where the plaintiff showed a reasonable and substantial likelihood that the defendant, if not enjoined, would continue to violate the laws at issue in the future); (*see* Doc. 61, at 45–49). Finally, the public interest would not be disserved by a permanent injunction. If Roberts is enjoined from interfering with Bandy's ownership rights in the Acreage, he will be prevented from fraudulently representing an ownership interest to potential buyers, neighbors, local government, and the public at large, thereby protecting their interests from Roberts's fraud. Therefore, the Court will grant the permanent injunction requested by Bandy.

### E.   Punitive Damages

Bandy claims that Roberts engaged in a fraudulent, intentional, and malicious scheme to steal money and then land from Bandy and that such conduct merits deterrence in the form of punitive damages. In Tennessee, a court may find a defendant liable for punitive damages only if it finds a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly:

> A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. *Cf.* T.C.A. § 39–11–302(a) (1991)

(criminal definition of "intentional").  A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation.  *See First Nat'l Bank v. Brooks Farms*, 821 S.W.2d 925, 927 (Tenn.1991).  A person acts maliciously when the person is motivated by ill will, hatred, or personal spite.  A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.  *Cf.* T.C.A. § 39–11–302(c) (1991) (criminal definition of "reckless").

*Id.*  "Punitive damages are [] appropriate only in the most egregious cases and, consequently, a verdict imposing such damages must be supported by clear and convincing evidence."  *Goff v. Elmo Greer & Sons Const. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009) (citing *Hodges*, 833 S.W.2d at 902).  "Evidence is clear and convincing when it leaves 'no serious or substantial doubt about the correctness of the conclusions drawn.'"  *Id.* at 187 (quoting *Hodges*, 833 S.W.2d at 902 n.3).

Bandy argues that the following acts constitute intentional, fraudulent, and malicious misconduct:  (1) Roberts imposing baseless fees and shortchanging Bandy in all the loans, (2) Roberts charging a plainly usurious interest rate in the Third Loan, and (3) Roberts misrepresenting his intent to return the Acreage to Bandy and allow repayment on the Third Loan.  Because the Court did not find Roberts liable for fraud or breach of contract for the allegedly fees and interest charged on the First and Second Loans, it will not find Roberts liable for punitive damages for charging those amounts.  However, the Court finds by clear and convincing evidence that Roberts acted fraudulently, intentionally, and maliciously with respect to misrepresenting his intent to return the Acreage and charging a usurious rate on the Third Loan.

The Court has already found Roberts liable for fraud with respect to the Third Loan.  *See supra* Section III.A–B.  The Court finds that Bandy proved such fraud by clear and convincing

evidence because Roberts's contention that the Third Loan was a sale was not credible whatsoever, particularly in light of his own testimony and contemporaneous notes. (*See* Ex. 13; Doc. 61, at 88, 97–98, 152, 173; Doc. 62, at 81–84, 86–89.) Further, there was no justifiable reason for Roberts to record the quitclaim deed just five days after closing on the Third Loan with Bandy—instead, this evidence makes clear that Roberts intentionally and fraudulently misrepresented his intent to allow Bandy to repay the Loan in order to secure and record a deed to the Acreage and claim ownership. (*See* Doc. 61, at 46–49, 88, 97–98, 152, 173; Doc. 62, at 63, 76, 81, 86; Doc. 55, at 7.)

Similarly, with respect to Bandy's usury claim, the Court has already found Roberts engaged in unconscionable conduct by devising charges he never incurred and imposed an excessive interest rate in order to ensure he would be able to take the Acreage at minimal cost. *See supra,* Section IV.B.ii. The Court finds by clear and convincing evidence that this conduct, too, was intentional. Roberts readily admitted he performed no due diligence or other services as a part of issuing the Third Loan, and he did not actually incur any legal fees—this was his intentional practice to minimize his own expenses. (Doc. 62 at 43, 54–55, 95–96; Ex. 12, at 3.) Roberts also testified that, at the time he agreed to the Third Loan, he knew Bandy was not a good credit risk, that he was "probably broke," that he assumed Bandy would default, and that he knew that if Bandy did not repay him, he would be able to take the Acreage. (Doc. 62, at 56, 63, 76, 78–80, 86.) This evidence shows to a clear and convincing degree that Roberts intentionally and maliciously charged these fees as part of a larger scheme to take the Acreage at minimal cost to himself. [18]

---

[18] Tennessee's usury statute awards additional damages for "unconscionable conduct" as a punitive measure, not intended to compensate for a plaintiff's injury, requiring that the lender

Tennessee law provides that "[i]n an action in which the claimant seeks an award of punitive damages, the trier of fact in a bifurcated proceeding *shall* first determine whether compensatory damages are to be awarded and in what amount and by special verdict whether each defendant's conduct was malicious, intentional, fraudulent or reckless . . ." and, if the factfinder finds a defendant liable for punitive damages, shall thereafter determine the amount of such damages in an immediate, separate proceeding.  Tenn. Code Ann. § 29-39-104; *see also Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992).  The Court of Appeals of Tennessee has found that the statute's mandatory language applies with equal force in bench trials and jury trials, and therefore, the Court must hold a separate proceeding to determine the amount of punitive damages.  *Hudson, Holeyfield & Banks, G.P. v. MNR Hosp., LLC*, No. W201900123COAR3CV, 2020 WL 4577483, at *10–*11 (Tenn. Ct. App. Aug. 7, 2020)

refund twice the amount of any interest collected.  Tenn. Code Ann. § 47-14-117(c); *see Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 906–07 (Tenn. 1999).  "Because multiple [statutory] damages are punitive in nature and not intended to compensate for the plaintiff's injury, a plaintiff cannot recover both punitive damages and multiple damages in the same cause of action, even if they are each available, because receipt of both forms of enhanced damages violates the principle against double recovery."  *Concrete Spaces*, 2 S.W.3d at 907 (citing *Smith Corona Corp. v. Pelikan, Inc.,* 784 F.Supp. 452, 483 (M.D. Tenn. 1992)); *Lien v. Couch,* 993 S.W.2d 53, 58 (Tenn. App. 1998); *Edwards v. Travelers Ins. of Hartford, Conn.,* 563 F.2d 105, 119–120 (6th Cir. 1977); *Lorentz v. Deardan*, 834 S.W.2d 316, 320 (Tenn. Ct. App. 1992).  In this case, Bandy is not entitled to multiple damages under the usury statute because he never actually paid any interest or fees on the Third Loan, so there is no risk of double recovery with respect to the multiple statutory damages and punitive damages.  Bandy is entitled to reasonable attorneys' fees for Roberts's unconscionable conduct under the usury statute, but attorneys' fees awards are not punitive in nature, but rather compensatory.  "[A]ttorney's fees are not punitive in nature.  Attorney's fees are meant to be compensatory, and it is therefore inappropriate to award attorneys' fees as punitive damages."  *Bridgefourth v. Santander Consumer USA, Inc.*, No. W2013-02468-COA-R3CV, 2014 WL 3563470, at *1 (Tenn. Ct. App. July 21, 2014) (quoting *Miller v. United Automax*, 166 S.W.3d 692, 697 (Tenn. 2005); *Buttrey v. Holloway's Inc.*, No. M2011–01335–COA–R3–CV, 2012 WL 6451802, at *13 (Tenn. Ct. App. Dec. 12, 2012)) (internal citations and quotation marks omitted).  Therefore, the Court's awards of reasonable attorneys' fees under the usury statute and punitive damages are not inconsistent remedies and do not risk double recovery.  *See Garrett*, 844 S.W.2d at 180.

("Because the trial court did not conduct a bifurcated hearing on the amount of punitive damages, we find it necessary to vacate the award of punitive damages and remand for further proceedings."). Therefore, Court will take up both punitive damages and attorneys' fees at the hearing set for **September 15, 2022**, at **10:00 a.m.**

## V. CONCLUSION

For the foregoing reasons, the Court has concluded that Roberts is **LIABLE** for fraudulent inducement to contract and constructive fraud with respect to the Third Loan, tortious interference with Bandy's land-sale contract with the Odinets, and usury. The Court has also concluded that Bandy proved by clear and convincing evidence that Roberts intended to interfere with the land-sale contract, Roberts engaged in unconscionable conduct, and Roberts acted fraudulently, intentionally, and maliciously. However, the Court has found that Roberts is **NOT LIABLE** for fraudulent inducement to contract, constructive fraud, or breach of contract with respect to the First and Second Loans, nor is he liable for conversion. As a result of these conclusions, the Court **AWARDS** Bandy the following remedies:

1. rescission of the Third Loan contract[19];

2. $210,000 for treble the compensatory damages for loss of the proceeds of the land-sale contract with the Odinets;

3. reasonable attorneys' fees and expenses for Bandy's usury claim;

4. a declaratory judgment that the quitclaim deed executed by Bandy, dated June 9, 2017, is invalid and unenforceable, and Bandy owns the Acreage in fee simple, subject to no claim by Roberts;

---

[19] This remedy results in Bandy owing Roberts the return of the $31,000 disbursement he received from the Third Loan. This amount shall be deducted from the monetary damages to be awarded to Bandy in this action.

5. a permanent injunction prohibiting Roberts (or anyone acting in concert with him) from taking any action that would adversely affect Bandy's ownership rights in the Acreage, including prohibiting Roberts (or anyone acting in concert with him) from selling, alienating, encumbering, or transferring any interest in the Acreage; and

6. punitive damages in an amount to be determined in a separate hearing.

Further, the Court **SETS** an attorneys'-fees and punitive-damages hearing for **September 15, 2022**, at **10:00 a.m.**  The parties **SHALL** file any documentation to support or contest the amount of such awards no later than **September 8, 2022**.

      **SO ORDERED.**

                              */s/ Travis R. McDonough*
                              **TRAVIS R. MCDONOUGH**
                              **UNITED STATES DISTRICT JUDGE**